Eladio Sanchez GOMEZ, Libelant,

v.

THE SS DOROTHY, her engines, boilers,
etc., and A. H. Bull Steamship Co.,
Respondents.

No. 98.

United States District Court
D. Puerto Rico.

Sept. 25, 1959.

Jerome Golenbock, New York City, and Stanley L. Feldstein, San Juan, P. R., for libelant.

Rafael O. Fernandez, Hartzell, Fernandez & Novas, San Juan, P. R., for respondents.

DELEHANT, District Judge (retired, serving by assignment).

Filed originally in the United States District Court for the Southern District of New York on July 18, 1956, this action was, on July 26, 1956, upon motion of respondents and with the consent of the libelant, transferred to this court pursuant to the provisions of Title 28 U.S.C. § 1404(a), by order of the court in which it had been instituted. The transfer was made without reservation, restriction or condition. The issues were brought to maturity here. Reserving for the moment the impact upon such issues of pre-

trial discovery proceedings, they are to be found in the libel of the libelant and the answer filed by the respondent A. H. Bull Steamship Company.

The summarization of those pleadings may serve to expose the issues. In that effort the court, in consequence of the manner in which the answer is prepared, finds it convenient, first to recall the averments of the libel with immediate notation of the response of the answer to each such averment, and then to set out the affirmative allegations of the answer. The pleadings may be followed more understandingly if, in its restatement, the court preserves the paragraphing of each pleading to which, from time to time, it alludes. The answer will be referred to as made by the "respondent" in full awareness that it is ostensibly made by respondent, A. H. Bull Steamship Company, and reflects as well the position of the respondent vessel.

The following numbered allegations of the libel are fully admitted by the answer:

1. Libelant, at all material times was and is a citizen of the United States, residing in the Commonweath of Puerto Rico.

2. The "SS Dorothy," at the institution of the action was, or during its pendency would be, within the jurisdiction of the United States District Court for the Southern District of New York.

3. Respondent, A. H. Bull Steamship Company, at all material times was and is a duly organized New York corporation, and the owner and operator of "SS Dorothy."

5. On or about December 18, 1953, "SS Dorothy" was in a port in Puerto Rico.

6. On or about December 18, 1953, respondent (obviously meaning A. H. Bull Steamship Company) had contracted with Bull Insular Lines for the movement and handling of the cargo of "SS Dorothy."

The following allegations of the libel are, in the ways immediately hereinafter respectively set out, partly admitted and for the rest denied:

4. At all times set out in the libel, respondent A. H. Bull Steamship Company, owned, operated, managed, maintained, supplied, manned, provisioned and was in possession and control of "SS Dorothy." Touching that averment, the answer "admits that at the times mentioned in the libel it owned the SS 'Dorothy' and operated, managed, maintained, supplied, manned, provisioned, and was in possession and control of those portions of the SS 'Dorothy' which were not operated, managed, maintained, supplied, manned, provisioned and in the possession and control of Bull Insular Line, Inc., its agents, servants and employees and other independent contractors, their agents, servants and employees." Except as just quoted, the answer denies each and every allegation of paragraph 4 of the libel.

12. All and singular, the premises are true and within the admiralty and marine jurisdiction of the United States, and of the court in which the suit was instituted. Touching that averment, the answer "admits that the allegations made in the libel are within the admiralty and marine jurisdiction of the United States and of this honorable court, but it denies each and every other allegation" of paragraph 12 of the libel.

All other allegations of the libel are categorically (except as noted in the next paragraph) denied by the answer. Briefly summarized, they are:

7. On or about December 18, 1953 libelant was in the employ of Bull Insular Lines as a longshoreman, and in that capacity was aboard "SS Dorothy" performing work in connection with the movement and handling of its cargo. (Respecting which the answer merely denies knowledge or information.)

8. On or about *such* date, while so working, and "while working under and by authority of the master, owner, charterer or agent of" "SS Dorothy" and A. H. Bull Steamship Company, while attempting to receive a sling loaded with

sacks of sugar, the libelant was struck by some of the sacks of sugar "due to the defective, faulty and improper operation of the winch" where he was working, causing him to be severely and seriously injured.

9. Such occurrence was caused without contributing fault or neglect on libelant's part, and "solely by the defective, unsafe and unseaworthy condition of the vessel and the defective condition of the said winch where libelant was working, and by the fault and negligence of the master, officers and crew of the said vessel and by the fault and negligence of the respondents" in sundry specified particulars, including failure to furnish libelant with a safe place to work; failure to provide libelant with a safe and seaworthy vessel and to keep it in such condition; failure to have aboard the vessel a safe, competent and adequate crew and officers; failure to warn libelant of the dangers to be encountered in such work; failure properly to supervise the work; failure to warn libelant of the dangerous, defective and unsafe condition of the vessel, her compartments, appliances and cargo; failure to promulgate and enforce proper and safe working rules; and general failure so to maintain and operate the vessel as to avoid the pleaded misadventure, "all of which the master, owner or charterer of said vessel and the respondents knew or should have known."

10. By reason of the premises, libelant sustained serious and severe injuries, which he identifies and alleges in undefined part to be permanent, has sustained and will hereafter sustain liability for treatment on account thereof, has undergone pain and suffering, and has lost and hereafter will lose sums of money which, otherwise, he would have earned.

11. "Eleventh: That although the analogous statute of limitations in Puerto Rico may have run, laches does not apply in this instance for the following reasons:

"1. The respondent had due notice of the accident and of the claim made in the Fondo del Seguro in Puerto Rico through its subsidiary corporation and upon information and belief, the respondent A. H. Bull SS Co. has in its possession an accident report and complete availability for making an investigation of the accident and the claim for relief.

"2. That until the decision on appeal in Jose Guerrido v. Alcoa SS Company, et al. in the Court of Appeals of the United States for the First Circuit, which was decided on June 8, 1956, there was no cause of action under the prior law as it applied to longshoremen in Puerto Rico under the decision of the Lastra case and also in the lower court's decision in the same Guerrido case. When the libelant became aware of his remedies on June 8, 1956, he acted promptly in pursuit thereof. It would be manifestly unjust to apply laches in the instant case because the interval of time between the date when his remedy first became apparent and the date that the suit was instituted, is actually less than two months.

"3. That the analogous statute of limitations for the cause of action for unseaworthiness has not as yet run. The action for unseaworthiness is predicated upon a breach of warranty and does not fall within Title 1 [31] of the Laws of Puerto Rico, Section 5298, but on the contrary, falls within Title 31 of the Laws of Puerto Rico. Section 5294 and the analogous statute of limitations is fifteen years."

13. By reason of the premises libelant has been damaged in the sum of $100,000.

14. Having concluded the statement of his asserted First Count with paragraph 13, libelant opens in paragraph 14 his assertion of a Second Count by the incorporation and reiteration of paragraphs 1 through 7 of the First Count. By way of response to that effort, the answer incorporates into itself and without repetition reiterates the admissions and denials of those paragraphs already identified herein.

15. It was the duty of respondents to provide libelant with a seaworthy and

safe vessel, appliances and crew, and to keep the same in a seaworthy condition.

16. The foregoing injuries of libelant were directly caused by the failure of respondents, their agents, servants and employees to provide a seaworthy, safe vessel and appliances and crew, and to keep the same in a seaworthy condition.

17. A reiteration of the amount of damages asserted in paragraph 13, *vide supra*.

It should be observed that, as has already been indicated, libelant undertakes to assert his claim in two counts, of which the first is reflected in paragraphs 1 to 13 of the libel, and the second in its paragraphs 14 to 17. Though thus pleaded, a single claim is made for the recovery of $100,000.

Beyond, and in addition to, its admissions and denials already noted, the answer, in separate numbered paragraphs, asserts what it characterizes as Affirmative Defenses. Without assenting to the objective accuracy of that characterization in all respects, and perceiving in some of the "affirmatively defensive" averments material which is obviously and in reality only a denial of certain averments of the libel, the court now quotes in full that further portion of the answer:

"18. That the injuries allegedly suffered by the libelant were caused without any fault or negligence on the part of the respondent, the officers and crew of the SS 'Dorothy', nor as a result of the unseaworthiness of the said steamship, her engines, tackle, apparel and/or appliances.

"19. That at all times mentioned in the libel, the SS 'Dorothy' was a seaworthy vessel provided with safety appliances and maintained, repaired and inspected according to the best accepted standards.

"20. That the occurrence alleged in the libel resulted exclusively from the libelant's own acts, omissions and inattention to duty or from the libelant's and his fellow workers' acts and/or omissions which produced a situation unknown to the respondent, but known by or obvious to the libelant; or that it was the natural consequence of the work being performed by the libelant.

"21. That the occurrence alleged in the libel was exclusively the result of the negligence and inattention to duty of the libelant, which negligence and inattention to duty was the proximate cause of the accident.

"22. If the libelant sustained any injuries and/or illnesses, as alleged in the libel, said injuries and/or illnesses were caused in whole or in part by libelant's own negligence and were not caused or contributed to in any manner by any negligence of the respondent.

"23. That the libelant had knowledge of and assumed the risks incident to his employment and that the injuries suffered by him were caused by and arose out of such risks.

"24. That the occurrence alleged in the libel was the result of an unavoidable and unforeseeable accident.

"25. The libelant's alleged cause of action was barred:

"(a) By the provisions of Section 1868 of the Civil Code of Puerto Rico, 1930 ed. (31 L.P.R.A. § 5298) becuase the libel herein was filed more than one year after the occurrence of the alleged accident.

"(b) By the provisions of Section 31 of Law No. 95 [45] of the Legislature of Puerto Rico, approved April 18, 1935, as subsequently amended, (11 L.P.R.A. § 32) becuase the libel herein was filed more than one year after the final decision of the Manager of the State Insurance Fund with respect to the alleged accident.

"(c) By laches of the libelant in failing, without reasonable justification or excuse to institute this action within the time allowed by the above-mentioned statutes.

"(d) By laches of the libelant in having delayed the filing of this action until approximately two years after the occurrence of the alleged accident, without reasonable justification or excuse, thereby causing serious impediment, prejudice and inconvenience to the respondent in its defense."

The prayer of the libel follows:

"Wherefore, libelant prays:

"1. That process *in rem* may issue in due form of law, according to the practice of this Honorable Court in causes of admiralty and maritime jurisdiction, against the said vessel, 'SS Dorothy', her engines, boilers, apparel, tackle, furniture, etc., and that all persons having or claiming any interest therein may be cited to appear and answer all and singular the matters aforesaid;

"2. That process *in personam* may issue in due form of law, according to the practice of this Honorable Court in causes of admiralty and maritime jurisdiction, against the respondent A. H. Bull SS Co., owner, operator and/or charterer of the vessel, 'SS Dorothy', and that said company may be cited to appear and answer all and singular the matters aforesaid; and in the event that the respondents cannot be found in this District or within this jurisdiction, then all goods, chattels and effects belonging to it within this District or within this jurisdiction, and in particular the vessel, 'SS Dorothy' and her engines, boilers, apparel, tackle, furniture, etc. be attached in the amount of One Hundred Thousand ($100,000.00) Dollars, the sum sued for in this Libel, with interest and costs of disbursements of the libelant;

"3. That this Honorable Court may be pleased to decree to the libelant his damages with interest and costs, and that the said vessel, 'SS Dorothy', her engines, boilers, apparel, tackle, furniture, etc., may be condemned and sold to pay the same, and that the libelant may recover his damages from said respondent; and

"4. That the libelant may have such other and further relief in the premises as in law and justice he may be entitled to receive."

The prayer of the answer is for the dismissal of the libel with costs.

In the files of the action, among the discovery proceedings, are the following items:

(a) Certain interrogatories addressed to the libelant by the respondent, included in which are questions numbered 6 and 7 to which, under date of July 10, 1958 respondent made answers, all as next hereinafter set out:

"Question 6. State the amount of money you expended for medical attention and medicines as a result of the alleged accident, and to what extent you have become indebted for those items, if at all.

"Answer 6. I have not expended nor become indebted for any sum of money, but sums of money unknown to me were expended on my behalf.

"Question 7. State the amount of earnings or wages you have lost which you otherwise would have earned, as a result of the alleged accident, and the dates between which you lost the said earning (sic) or wages.

"Answer 7. Libelant claims one year's loss of earnings less thirty-eight hours at $1.72 an hour for the year immediately succeeding the accident. In the year October 1, 1952 to September 30, 1953, libelant worked a total of 1,482.75 hours."

(b) A request for admission served on libelant by respondent to which, on July 9, 1958 libelant made answer admitting the first four numbered items. Those four admitted items follow:

"1. At the time of the accident described in the libel in the above captioned case, libelant, Eladio San-

chez Gomez, was an employee of Bull Insular Line, Inc.

"2. Bull Insular Line, Inc. was an employer insured with the Puerto Rico State Insurance Fund at the time of the accident described in the libel in the above captioned case.

"3. For the injuries suffered as a result of the accident in the libel in the above captioned case, libelant, Eladio Sanchez Gomez, was awarded compensation by a decision of the Manager of the Puerto Rico State Insurance Fund dated July 20, 1954 in the case number 2B–22769.

"4. Libelant, Eladio Sanchez Gomez, did not appeal from the decision of the Manager of the Puerto Rico State Insurance Fund dated July 20, 1954 in the case No. 2B–22769."

(c) Among the interrogatories mentioned in subparagraph (a) hereof, supra, were items 1, 2 and 3, which were in this language:

"1–(a) Name or describe with particularity sufficient for identification each and every piece of gear or equipment of the vessel which you claim was defective and unsafe.

"(b) State in what respect each piece of equipment or gear is claimed to have been (1) defective; (2) unsafe.

"2. State in detail in what respect the winch mentioned in article ninth of the libel was defective.

"3. State in detail all the other particulars regarding the alleged fault and negligence of the respondents which you state in article ninth of the libel will be pointed out on the trial of this action."

To those three questions, libelant, on July 10, 1958, served a single and consolidated answer, which was filed July 16, 1958, in these words:

"1, 2, & 3. The winch was defective in that its mechanism was not operating properly."

Objection was made and filed on the day of the service of that answer to its asserted vagueness and generality.

And, on July 18, 1958, the libelant made and filed this supplemental answer:

"1. Libelant on the trial does not intend to prove that a specific portion of the winch broke."

Trial of the suit has been had to the court without a jury. Typewritten briefs of proctors for the several parties have been served and filed. The evidence, both oral and written, and the briefs have had the court's careful consideration. The case is ready for final ruling. The facts, as found, will first be set out.

In the finding and statement of the facts, let it be understood at the outset that all facts agreed upon in the pleadings, supra, and all admissions of fact made in the course of the discovery proceedings, supra, are taken and considered to be true without the necessity of present repetition.

The libelant, Eladio Sanchez Gomez, was born February 18, 1918 and was, therefore, thirty-five years, ten months of age on December 18, 1953. He was then, and is now, a citizen of the United States, resident in Puerto Rico. He had worked as a stevedore for some sixteeen years. On December 18, 1953 he was employed by Bull Insular Lines, Inc. as a longshoreman at an hourly wage of $1.72 for the hours of his actual work; and, on a shift from 4:00 to 11:00 o'clock, p. m. of that day was working on the second tweendeck of the hatch No. 1 of "SS Dorothy" in the storage and loading for shipment of sacks of sugar. His specific work was that of a handler of the bags after they had been brought upon the ship and deposited in the hold.

In the loading of the vessel with sacked sugar, the sugar was fastened into slings on the pier, then by the use of winch activated booms and ropes or cables, was lifted from the pier, moved over to a point where it was above the open hatch, and finally lowered into the cargo carrying space. The sling was

thereupon withdrawn and stevedores manually piled and made secure the deposited sacked sugar.

At about 10:30 or 10:35 o'clock p. m., what was to be the final slingload of sugar for the shift was being brought aboard. A signal was given alerting the stevedores to the imminence of the end of their shift and of their withdrawal from the ship. Libelant, thus informed, was working on the pier side of the vessel. He made minor adjustment of his clothes with a view to the end of his work, and started walking towards the square of the hatch.

At the same time, the shift's final slingload of sugar was being brought into the hold. As it came, it swung abruptly in libelant's direction, the loaded sacks of sugar were released from the sling, and one or more of them struck libelant and knocked him to the floor and rendered him unconscious. The evidence leaves in some uncertainty whether the release of the sacks from the restraining sling occurred before, or exactly when, or immediately after, libelant was struck. But it is obvious that the impact and the release, without the determination of precise priority as between them, occurred almost simultaneously.

The finding touching the cause of the striking of the libelant is reserved for later discussion and announcement.

Libelant, upon his injury, was, by his fellow workers, removed from the vessel and taken to a clinic or hospital. After treatment there for slightly less than a week, he was removed to another clinic or hospital in a different building, in which he remained continuously for somewhat more than seven weeks, after which he received further treatment as an out patient. During his hospitalization, supra, he underwent diagnostic and surgical and medical treatment and received nursing care.

As a direct result of his contact with the bags of sugar, libelant sustained extensive bruises and especially a fracture of his pelvis, which required his hospitalization and surgical and medical

attention, and also a condition characterized as hematurea; caused him to undergo conscious pain and suffering during the period of such treatment, and for a substantial time thereafter during 1954, and in diminished and relatively minor degree thereafter, and disabled him from performing gainful work through all of 1954 except thirty-eight hours thereof. It is fairly established and is found that in 1954 he sustained the loss of wages in the sum of $2,392.52. In making this finding the court acknowledges some perplexity over a period of residence in New York City by libelant. It is shown that he was there for an interval, and that he had some employment in that city. But exactly when the sojourn occurred, or how long, and for what total wage he worked during it may not be found with assurance. He was certainly disabled totally in the final thirteen days of 1953, of which eight days were almost certainly work days. He is found, therefore, to have sustained a loss of wages during that interval in the sum of $96.36, making his total wage loss up to December 31, 1954, $2,488.88. Still considering the element of loss of wages, the evidence, by way of stipulation, is that he worked in each of 1955 and 1956, as many hours as, or more than, he worked in 1952 or 1953 before his injury, and he did not, nor is it contended that he did, sustain any loss of wages in either of those years. In 1957, he worked only 791¾ hours, as compared with 1,231 hours in 1952 and 1,429¼ hours in 1953 before his injury. However, for two reasons, the court may not and does not find that the conceded reduction in hours worked, and consequently in wages received, during 1957, was due to the injury in suit. In the first place, the evidence does not satisfactorily support such a finding. And, secondly, he sustained on October 27, 1957 a distinct and further traumatic injury of his hip, which is not eliminated persuasively as a causative factor in the diminution of his working time during that year. For 1958 to date of trial, there is no evidence to support a finding of reduc-

tion in wages earned. And, from the evidence before it, the court is not convinced that the plaintiff had proved that, with reasonable certainty, he will in the future sustain any loss of earnings or wages as a result of the injury of December 18, 1953.

The pain and suffering consciously sustained before the trial by the libelant, and that which, with reasonable certainty as shown by the evidence, will be sustained in the future as a direct result of the injury, are found to have a fair and reasonable value of $2,000. The court rejects as unrealistic libelant's argument that this item should be compensated in a much greater sum.

After due consideration of all of the evidence, the court does not consider that proof has been made upon which a finding may be made of the fair and reasonable value or cost of the medical and surgical care, medicines, and hospital and nursing care, properly and with reasonable necessity bestowed upon the libelant as the result of the injury of December 18, 1953. Indeed, from the briefs, this ordinarily appropriate element of recovery appears not to be pressed upon the court. It is merely observed in passing that it seems not to be urged by respondent that no award is allowable for it by reason solely of the provision of such care under the Commonwealth compensation law, infra.

The court has thus proceeded with its findings of fact to a determination respecting the damages by the libelant sustained for which an award should be made, if it were assumed or found that he is entitled at all to recover against the respondents. That course has been thought to be appropriate in recognition of the possibility that it may ultimately be determined on appeal that the court is mistaken in the findings of fact now to be announced, and directly oriented to the legal responsibility to the libelant on the part of the respondents. The aggregate amount of the several items of damage thus found is $4,488.88.

But the critical question, and it is essentially one of fact, is upon the liability for the injury. It is rooted in the proximate causation of the casting of the sacks of sugar upon and against the libelant.

■■ At the outset, upon the question of the cause of the accident, the court expressly finds that the libelant was not himself negligent in any respect or particular. He did not by any negligence on his part provide either the sole proximate cause, or a contributing cause, of the accident. And, relevant to the asserted defense of assumption of the risk, and without proceeding to the issue of its legal availability, it is further found that the libelant did not know, or even have reason to know, or to apprehend, the risk of injury to himself in the manner and respect in which it occurred. He did not understandingly assume such risk.

The prime problem is whether the libelant has proved that there was a defect or inadequacy in the winch which proximately caused his injury. For if the winch was in good and safe operating condition, and injury came to the libelant through its improper use by one or more of his coworkers, or otherwise than from a defect in the winch itself, the respondents to this suit are not liable to him. He may recover against them, if at all, only for a breach of a duty by them owed to him in respect of the ship's equipment.

The court acknowledges that there is evidence before it, which, if credible and persuasive, would support the libelant's averment of the defective condition of the winch by which the handling of the sling load of sugar was being controlled. This evidence comes from Julio Betancourt Colon, Marcos Carrion Rexach, and Andres Aldoy Alvarez. Their relevant evidence is now briefly recalled, though without any intention entirely or exhaustively to reflect it.

*Betancourt* testified, *inter alia,* that he was the winchman actually operating the winch at the time of the injury; that as the slingload involved came from the shore and entered the hold the land, or outside, winch "stuck," "jammed" or

stopped and the load swung to the inside and struck libelant; that in that behalf the winch did not operate as it usually does; that the action of the winch was not attributable to anything the witness had done with it; that he had theretofore operated that winch for four or five hours that day, though he did not remember exactly which hours, but was certain that it was not at all before 4:00 p. m.; that he had had trouble earlier in that working shift with the winch; that as early as five o'clock on one occasion it had partially jammed, but had not wholly stopped; that it repeated that irregularity three or four times thereafter during the shift, and before the striking of libelant; that he did not personally report the irregular performance of the winch to any ship's officer or anyone else, but the signalman, Marcos Carrion, went to look for a mechanic. He also stated, however, that a man who came to oil or grease the winch around 7:00 o'clock p. m. was told about the jamming; that the contemplated greasing was not performed because the greaser went to look for some one else to observe the movement of the winch. Betancourt also testified that he had not, prior to 4:00 o'clock p. m. of December 18, 1953 worked on the cargo operations on the "SS Dorothy"; that he did not work on the vessel on the shift commencing at 8:00 o'clock a. m. on December 19, 1953, or any time that day; that he did not work on the ship on December 15 or 16 or 17; and that if any record shows him as working on it except for the 4:00 to 11:00 o'clock shift on December 18, 1953, the record is mistaken.

*Marcos Carrion Rexach* testified that he was working as a longshoreman in the capacity of signalman on the shift with libelant when he was injured and remembered the injury; that in his capacity he was directing the winch controlled movement of the sugar; that, at about 10:40 or 10:45 o'clock, while they were receiving a slingload of sugar that was being lowered into the hatch, it suddenly "jammed" or "banged" and swung

to the side and struck libelant; that, during the shift he had operated the winch as a relief man for about three hours; that he had noticed that the control of the winch was not operating properly; that he had spoken of that fact to the man who came to do the greasing, who, in turn, had talked to a second man who came and looked over the winch and directed him to finish the day's work with it, since only an hour or two of work on the shift remained; that the witness had not worked on the ship on December 15, 16 or 17, or, earlier than 4:00 p. m., on December 18, and did not work on it on December 19, 1953; that during the evening before the accident the winch, on occasion, had failed to hold in neutral position and had lowered cargo without the opening of steam, though that happened only once while he was operating it in relief; (by way of apparent modification of his earlier testimony while on the stand) that he had operated the winch for only an interval of twenty-five or thirty minutes to relieve the operator, and in the place of the regular relief man whose name he did not remember; that before the accident he had called the oiler and asked him to come and check the winch; that the oiler went to call another man who came, and with the oiler looked at the winch and then at the clock and directed that the winch be used as it was; that immediately before the accident the swingload was coming down, when it jammed and swung over and struck the libelant. In considerable detail this witness also testified to the manner in which winches of the nature involved are operated, and also to the way in which libelant was struck and later cared for.

*Andres Aldoy Alvarez* testified that he was foreman of longshoremen in hold No. 1, on duty during the shift when the accident occurred; that he did not see the occurrence but was on the pier when it took place; that Julio Betancourt was the winchman on duty at the winch in question at the time; that two winchmen were on duty and the other one was Eustachio Baez; that he had

worked on the ship two days before the day of the accident and on that day; that he does not remember Betancourt's working on the ship on the two days before, or the day after, the accident but knows that he was working when it happened; and that he saw Betancourt working at the winch when witness returned to the ship after the accident.

Upon the basis of the testimony of the three witnesses just mentioned, and especially Betancourt and Carrion, the court, if that testimony were regarded as credible and not successfully impeached or disputed, would be disposed to attribute the injury of libelant to a mechanical disorder in the winch, and to conclude that the respondents were liable to him on either or both of the pleaded grounds of failure to provide him with a seaworthy ship, and negligence in failing, despite notice either to repair the winch, or to take it temporarily out of service after notice of a defect in it. But, upon the record before it, the court considers that the evidence just outlined stands effectively discredited and is not to be believed. The disputing evidence is partly oral, but also partly documentary. The oral evidence was given by James A. Hickey, who on the date involved, was second mate, and by one Johnson, who was the second Assistant Engineer on duty on the "SS Dorothy." It is recognized that each of them was and is an employee of A. H. Bull Steamship Company, therefore, an interested witness. The documentary evidence includes certain ship's and stevedoring records.

First, there is persuasive evidence that Betancourt, so far from being the winchman on duty at the time of the incident, was not working at all during the shift when it happened, and also that he worked on "SS Dorothy" during its cargo operations at times when he flatly denied such work. Thus, Bull Insular Line, Inc. payroll records, received in evidence, show that he worked in loading operations on that vessel (a) on December 15, 1953 from 8:00 a. m. to 4:00 p. m., (b) on December 16, 1953 from 7:00 a. m. to 4:00 p. m., (c) on Decem-

ber 17, 1953 from 4:00 p. m. to 11:00 p. m., (d) on December 18, 1953 from 7:00 a. m. to 4:00 p. m., and (e) on December 19, 1953 from 7:00 a. m. to 1:15 p. m. This is in direct contrariety to his own testimony that he had not worked on the vessel on December 15, 16 or 17, 1953, or on December 18, 1953 before 4:00 o'clock p. m., and that he did not work on it on December 19, 1953. More to the point, the payroll for the December 18, 1953 shift from 4:00 p. m. to 11:00 p. m. does not contain his name at all. Confronted with the probable existence of such records, he insisted that they were all erroneous. But his position is unconvincing. The court does not declare that such payroll records are infallible. But there is considerable reason to credit them. They are kept in the usual course of business. They are the basis of an employer's statistics and, among other things, serve to support its payment of wages and its accounting to various official regulatory agencies. They are at least presumptively correct; and the presumption is hardly repelled or nullified by unaided human recollection advanced nearly five years after the event, whose only corroboration is other human recollection from an associated source. The court has concluded, and finds, that Betancourt was not on duty at all when the accident occurred. And that finding both discredits his testimony in its entirety, and serves to destroy the significance of the testimony respecting the operating condition of the winch and events related to it given by Andres Aldoy Alvarez, who swore positively, even in the face of obvious dispute, that he personally saw Betancourt on duty during the critical shift.

According to the foregoing payroll record for the 4:00 to 11:00 o'clock p. m. shift on December 18, 1953, Marcos Carrion Rexach was working during that shift. But in respect of his testimony, especially concerning the pre-accident condition of the winch, he is impeached by a pretrial affidavit made, signed and sworn to by him. That affidavit was made and signed by him before a Notary

Public, who is also an attorney at law and an investigator, on July 9, 1957, about a year before the trial and some three and one-half years after the accident. The original affidavit is in the Spanish language, in which the interview leading up to it was held. Included in the affidavit is the following language in an admittedly correct English translation:

"I had been acting as signal man that day from 4:00 P. M. until the time the accident occurred. * * * No other accident occurred that day. The winches had worked very normally."

That declaration not only disputes the factual testimony to the contrary, supra, given on the trial by the witness, but it cuts away the foundation for his testimony respecting his contact with the oiler and another employee of the respondent on the score of inspection of the winch, and direction to continue its use. To be sure, he testified that the affidavit erroneously reflected his statement to the attorney-notary, and that he signed it without reading it, or knowing its language. Incidentally, too, he is disputed by the payroll record which shows him as working from 4:00 p. m. to 11:00 p. m. on December 17, 1953. The court frankly does not believe his testimony.

Finally, there is evidence, largely negative in character, supra, which tends to discredit the testimony respecting the winch given by Betancourt, Carrion and Aldoy. So far as it is oral, it comes from two responsible members of the personnel of "SS Dorothy" on duty during the shift when libelant was injured. One was James A. Hickey, then second mate, the other was one Johnson, the second assistant engineer. Their oral evidence was fortified by two exhibits. Of these, one was Sheet 4, Deck Log Book for December 18, 1953 of "SS Dorothy," the other was the Engineers Log Book of the vessel for the same date. Those two witnesses separately disclaimed their receipt of any notification or information from any source, of the existence of any irregularity in the condition of any winch

on the day in question, or of the making of any repairs of any winch, or any investigation respecting any winch. And Johnson identified himself as the member of the ship's crew through whom any such information or any complaint of that nature would pass, and under whose direction such repairs would be made. Neither of the log records contains any reference to any complaint or investigation respecting the condition of a winch, or the making of repairs on a winch, though the witnesses testified that, when they occur, a record of such incidents should be made, and would be expected to be found, in the log books. The deck log book does bear the notation that at 10:50 o'clock p. m. the stevedores having finished their work went ashore. And the engineer's log book, as of the same hour and minute, bears a memorandum "Steam off deck" which the witness, Johnson, interpreted from mariners' language to mean that the equipment was ready for use the next day.

Also contained on the deck log book and made by the witness, Hickey, in the course of his duties as of 10:35 p. m., or 2235 o'clock, is an entry in this language:

"Eladio Sanchez stevedore working in #1 hatch struck by a draft of sugar. Extent of injury unknown. Taken to hospital immediately by J. A. Cana, Boss Stevedore, A. Aldoy Foreman in charge at time."

A record of the accident was thus made at or shortly after its occurrence. It was not, by silence, kept unnoticed.

The engineer's log book in various places identifies a man, named Merkel, as the oiler on duty during the shift. He was clearly the oiler or greaser to whom witnesses for libelant referred. He was not called as a witness, nor was his absence explained. But the court attributes scant significance to that circumstance in its context. So far as the court may determine, the oiler was mentioned only during the trial. And that was quite too late to expect his production as a witness.

■■ Upon the entire evidence the court finds that the libelant has not proved either that the pier, or outside, winch was defective or not safely operable at or before the time of the injury to libelant, or that any such defect or inoperability was the proximate cause of the injury by him sustained. And the court further finds that there has been no proof of the unseaworthiness of "SS Dorothy" at the time involved, or of the failure by its owner and operator to provide the libelant with a safe place to work. In this relation, it is now noted that there is also a failure on the libelant's part to prove any of those other elements of unseaworthiness and negligence mentioned in paragraph ninth of his complaint, which, briefly recalled, include failure to have aboard the vessel a safe, competent and adequate crew and officers; failure to warn libelant of dangers to arise in the performance of his work; failure properly to supervise the work; failure to warn the libelant of the dangerous, defective and unsafe condition of the ship; failure to promulgate and enforce proper and safe working rules; and general failure in the maintenance and operation of the vessel in such wise as to avoid the accident.

At this point, it appears to be in order to declare that, notwithstanding the court's factual finding just announced and discussed, and its now frankly acknowledged conviction that Betancourt, Carrion and Aldoy, as witnesses in libelant's behalf, wilfully testified falsely in the matters adverted to, and may not be considered merely to have been honestly mistaken, the court is under no impression at all that libelant's proctors, or either of them, presented such evidence, aware of its falsity, or are otherwise censurable for their participation in the trial. On the contrary, the court is persuaded that in good faith they relied on and presented to the court such evidence as was brought to them in support of their case. And, thus convinced, although firmly declining to credit, or to

follow, such evidence, the court offers not the slightest criticism of the proctors who tendered it, and entertains no impression to their professional discredit.

In the light of the foregoing factual findings, the legal conclusions of the court upon the questions presented to it may—and should—be set out very briefly.

Upon one point strongly urged and much discussed by proctors for respondent, the court is persuaded that announcement of its conclusion should be made. If the facts otherwise warranted a recovery for libelant, the court does not consider that the prosecution of this suit is barred either by limitations strictly so called, or by laches. The pleading of defenses on those grounds has already been noted; but they are not believed to be well taken.

■ That the libelant's claim, in each of its several aspects, is rooted in maritime law seems not seriously to be questioned. By the teaching of Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, the federal maritime law would appear to govern its determination. In such law there is no imperatively thwarting statute of limitations. But whether an admiralty action of this character is timely brought is to be determined by the application to it of the equitable doctrine of laches. Guerrido v. Alcoa Steamship Company, 1 Cir., 234 F.2d 349; Le Gate v. The Panamolga, 2 Cir., 221 F.2d 689. In Kane v. Union of Soviet Socialist Republics, 3 Cir., 189 F. 2d 303, 305, which affirmed a dismissal for laches of a longshoreman's suit, the reach of the doctrine of laches was stated briefly in this fashion:

"Laches consists of two elements, inexcusable delay in instituting suit and prejudice resulting to the respondent from such delay."

And in the same case, the fifth paragraph of the syllabus states:

"In suit in admiralty for * * * personal injuries, there was a pre-

sumption of prejudice to respondent arising from libellant's delay in bringing action making it incumbent on libellant to plead and prove facts negativing laches."

Thus, where the factor of inexcusable delay in institution of a suit is found to be present, the libelant should be required to show the absence of prejudice to his adversary from such delay.

■ In common with other cases, the Kane opinion recognizes that in applying the doctrine of laches in such cases, the federal courts customarily resort to the analogy of state statutes of limitations, although there is no rule inflexibly requiring them so to do. Since this suit was instituted—and properly—in the United States District Court for the Southern District of New York upon a claim arising upon its facts within the Commonwealth of Puerto Rico, the question arises as to the identity of the state to whose statutes of limitations resort should be had by way of analogy. The court is disposed to think that it is proper so to consider the New York statutes. This is true despite the unconditioned character of the transfer of the action to this court for disposition. It must not be forgotten that it was properly brought in New York, and that it rests upon a claim arising not under the law of Puerto Rico but by virtue of American maritime law. Pope & Talbot, Inc. v. Hawn, supra; Le Gate v. The Panamolga, supra; May v. Steel Navigator, D.C.N.Y., 152 F.Supp. 254. As is at once apparent from the Le Gate opinion, there was no delay beyond the applicable statutory period under New York law in the institution of this case. So, if New York's law of limitations be regarded, the suit is admittedly timely.

Whether it was brought with comparable timeliness if Puerto Rico law be resorted to is not equally certain. Two sections of the Code of the Commonwealth are drawn to the court's atten-

tion. One is Article 1868 of the Civil Code, 31 L.P.R.A. § 5298, whereby it is declared that:

"The following prescribe in one year:

\* \* \* \* \* \*

"(2) Actions to demand civil liability for \* \* \* obligations arising from the fault or negligence mentioned in section 5141 of this title, from the time the aggrieved person had knowledge thereof."

The other is section 31, Law No. 45, approved April 18, 1935 as amended, 11 L.P.R.A. § 32, whereby an action for damages against a third party in behalf of an employee of another entitled as a result of an industrial accident to workmen's compensation benefits, as against his employer, must be brought within one year after the final decision of the Manager of the State Insurance Fund with respect to the alleged accident.

■ Against the backdrop of those statutes, these dates should be recalled. The libelant's injury was received on December 18, 1953. The final decision of the Manager of the State Insurance Fund in respect of liability for his injury was made and given July 20, 1954. This suit was filed July 18, 1956. It thus appears that, prior to the institution of the action, two years seven months had elapsed from the time of the injury, and two years, less two days, from the date of the final determination of the Manager of the State Insurance Fund.

Was that "inexcusable delay?" In the context of the suit, this court thinks the question should be answered negatively. One has to be mindful of the origin and nature of libelant's claim. Through many years, including 1953 through 1955, under the rule of Lastra v. New York & Porto Rico Steamship Company, 1 Cir., 2 F.2d 812, it had been and was accepted as controlling law that the substantive admiralty law of the United States was inoperative in the navigable waters of the Commonwealth of Puerto Rico.

So when this claim arose, and for many months thereafter, one believing himself to possess such a claim, was confronted with the certainty that, if he instituted suit in any District Court of the United States, his case would be dismissed on the authority of the Lastra case, leaving him with the mere right to appeal, which was presumptively valueless in the face of the position of the Court of Appeals, First Circuit. Finally, such an action was instituted in the same court where this one was commenced, and, like this one, was transferred for disposition to this court, which promptly dismissed it on the authority of the Lastra ruling. The libelant in that case appealed, and on June 8, 1956 the Court of Appeals, First Circuit, reversed the judgment of this court and expressly overruled the Lastra case. Guerrido v. Alcoa Steamship Company, 1 Cir., 234 F.2d 349 (Reversing Guerrido v. The M/V Corona, D.C.P.R., 134 F.Supp. 459). This suit was filed on July 18, 1956, only forty days after the filing of the opinion, and somewhat less than that after the date of the mandate in the Guerrido case. Prior to the Guerrido opinion, that in the Lastra suit constituted, if not an insuperable barrier, at least a strongly repressive deterrent, to the institution of a suit of this nature. The tenuous prospect of ultimate success, and the inevitable factor of expense, conspired to prevent the starting of such cases. Once the legal obstacle was removed, the present libelant proceeded very promptly. Regard being had to that setting, and to the obviously drastic character of Puerto Rico's period or periods of limitations, this court does not consider that the suit was instituted with inexcusable tardiness.

■ Nor, accepting the view that libelant carried the burden upon the question now reached, does the court consider that such delay as occurred in starting the suit resulted in prejudice to the respondents in the matter of trial. In a brief, served and filed after trial, the proctor for respondents—mistakenly rather than deliberately, as the court is satisfied—made this declaration:

"When the libel was filed on July 18, 1956 in New York, the respondent learned for the first time that the libelant had allegedly suffered injuries aboard the vessel."

The infirmity of that statement is that it is demonstrably untrue in point of fact. For, as the court has already found, on the very night of the injury, the vessel's mate entered in its deck log a memorandum disclosing the injury. The respondent has had information of it continuously since that time. That, of course, is not to say that it also had from the time of injury notice that the libelant attributed it to a breach of duty to him by the vessel and its owner.

But upon a pragmatic basis, it is concluded that no prejudice to the defense resulted from delay in filing the case. This case has been fully tried. The evidence, in resistance to the claim, appears clearly to have been available on the trial. It is difficult to understand how it could have been assembled more effectively at an earlier date. Except, perhaps, the oiler or greaser, the witnesses were present who would ordinarily have been expected to be on hand, regardless of the time of trial. The respondents have received a thorough and an unbothered defense. And this statement is not bottomed upon the result already foreshadowed and shortly to be announced.

■ Although it is to no real purpose, it is observed in passing that if the credible evidence had sustained the libelant's claim, the court would have encountered no legal difficulty in awarding him a decree. The rights and remedy accorded to seamen, The Osceola, 189 U. S. 158, 159, 23 S.Ct. 483, 47 L.Ed. 760; Mahnich v. Southern Steamship Company, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, have been clearly extended to longshoremen performing work on vessels in maritime service, even while temporarily at rest in port. Seas Shipping Company, Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot,

514

Inc. v. Hawn, supra; Alaska Steamship Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming 9 Cir., 205 F.2d 478, rehearing denied 347 U.S. 994, 74 S.Ct. 848, 98 L.Ed. 1127; Grillea v. United States, 2 Cir., 232 F.2d 919; and Guerrido v. Alcoa Steamship Company, Inc., supra.

But acknowledging the availability to the libelant, facts warranting, of a legal remedy through the avenue here pursued, the court has finally to declare and does declare and conclude that under the evidence before it, the libelant has not established his factual right to recover. He has, indeed, set out a claim, which if established would have supported recovery in his behalf. But against the claim has to be written the conclusion, "it is not proved." The proofs, in the way of credible and persuasive evidence, simply do not sustain the libelant.

Accordingly, by the court's decree, the action and the libel of the libelant will be dismissed with prejudice, costs will be taxed against libelant, and such other orders appropriate in the light of the records and files of the case will be made and given as may be necessary to discharge the vessel and its owner from any liability or restraint by reason of the suit.

Respondents' proctor will forthwith prepare a decree in accordance with this announcement, and submit it to libelant's proctors for suggestions of modification or correction, as to form, and, if there be no such suggestion, to the writer hereof for signature and entry, or if there be such suggestion or suggestions of modification or correction as to form, then to the writer hereof, along with such suggestion or suggestions, for settlement, signature and entry. The Decree will be so prepared as to be effective and to speak, not as of this date or of the date of its signing, but as of the date of its filing in the office of the clerk.

The clerk will transmit forthwith by United States mail copies of this memorandum to Messrs. Golenbock, Feldstein and Fernandez, proctors in the suit.